**STATE of Missouri,**
**Plaintiff-Respondent,**

v.

**Clayton Perry BRIGHAM,**
**Defendant-Appellant.**

No. 14132.

Missouri Court of Appeals,
Southern District,
Division Two.

April 18, 1986.

Motion for Rehearing and to Transfer
Denied May 12, 1986.

Susan Lynn Hogan, Mark V. Clark, Columbia, for defendant-appellant.

William L. Webster, Atty. Gen., Mary Elise Burnett, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

MAUS, Judge.

The defendant was charged with having committed murder in the second degree on May 15, 1984, by stabbing to death his ex-wife, Angela Michelle Cole. § 565.004, RSMo 1978,[1] (repealed effective October 1, 1984). During the trial, after presenting the testimony of a psychologist, the defendant withdrew his plea of not guilty by reason of mental disease or defect. The jury was instructed upon murder in the second degree and upon manslaughter. They were also instructed on diminished capacity under § 552.030.3, RSMo 1978. That subsection was deleted by Laws of Mo.1985, p. 987. The jury found the defendant guilty of murder in the second degree and assessed his punishment at imprisonment for life. He was sentenced in accordance with the verdict.

A detailed statement of the evidence is not required as the defendant does not question the sufficiency of the evidence. However, discussion of the points on appeal requires consideration of portions of the defendant's testimony. Of course, it was the prerogative of the jury to reject all or part of the testimony. *State v. Wilson*, 645 S.W.2d 372 (Mo.App.1983). An outline of the evidence, giving recognition to his testimony, follows.

The defendant and Angela were married October 16, 1982. They lived in Springfield. At an unspecified time and for an unstated duration, the defendant was in Italy. Their brief marriage was tempestuous. There was evidence Angela associated with other men during the marriage. There was also evidence of the defendant's unreasonable jealousy of Angela's activities. The parties separated at least twice during their marriage. They were divorced in March, 1984. After the divorce, the defendant moved to Omaha, Nebraska, to live with his sister and her husband.

The defendant frequently called a friend and former neighbor to inquire about his ex-wife. During one call he told her he had dreamed he killed Angela. He also said he was coming back to see Angela. The friend admonished him not to return and,

1. The statutes are cited throughout the opinion as in effect on the date of the homicide, May 15, 1984.

at the time, the defendant promised not to do so.

Testimony of the defendant included the following. That by a telephone call, Angela invited him to come down. He rode the bus from Omaha to Springfield. He brought no luggage and had only the clothes he was wearing. He arrived about 11:30 p.m. on May 14, 1984. He went to and was admitted to her apartment. They drank and had sex.

The next day Angela's parents picked her up about noon. The defendant remained out of sight. She returned between 3:00 and 4:00 p.m. Then, he testified, they again had sex in the bedroom. She asked him to engage in oral sex. He refused. She taunted him about his lack of sexual prowess. He dressed and went into the kitchen. She dressed and came into the kitchen. She continued to taunt him.

He seized an 8-inch butcher knife and started to stab her. She ran from the kitchen saying, "Clay, Clay." He ran after her and kept stabbing her. He said he couldn't stop. She fell on the floor in the bedroom and said, "God forgive me." Defendant surmised that she was asking God to forgive her for the life she had led. Defendant did not know why he stabbed her ten times. He had no intent to kill her before they started arguing. He said he didn't know the stabbing would be hurting her. He did not know she was dead when he left the apartment.

At 5:26 p.m. that afternoon, police officer Bledsoe was cruising in the area of the apartment. The defendant approached on foot and motioned for Bledsoe to stop. The defendant said, "Please help me, I've just killed my wife." The defendant told the officer he had been in a mental hospital. The defendant directed Bledsoe to the apartment. Another officer arrived. The defendant was placed in the second vehicle. After the apartment was entered, the defendant was arrested. While being driven to jail, the defendant asked the officer if Missouri had the death penalty. The defendant added that he deserved to die. At trial, the defendant admitted he had not been in a mental hospital.

The officers found the body of Angela rolled up in a comforter between the bed and the dresser. She had suffered five anterior stab wounds and five posterior stab wounds. One wound severed her windpipe. Two penetrated the abdominal cavity. One posterior wound was four inches deep and extended into a lung. Another severed a portion of the spinal cord, entered the lower lobe of the right lung and penetrated her liver. She had numerous "defensive" lacerations on her hands and arms. There was no explanation given for large bruises, approximately four inches by six inches, below the knee on the front of each leg.

The defendant's first point has the following background. He initially entered a plea of not guilty and a plea of not guilty by reason of mental disease or defect. As his fourth witness, the defendant presented a clinical psychologist he had employed. The psychologist stated his qualifications, explained his interview with the defendant and tests administered to the defendant in order to evaluate him.

This psychologist concluded the defendant was not "mentally ill." But, he had a "borderline personality disorder", which the psychologist classified as a mental defect. It was said to be a condition between neurotic and psychotic. The psychologist concluded, among other things, the following. The defendant could form an intent to do a physical act. He was aware that he had picked up the knife. He was aware he was stabbing Angela. But, he was not aware of the consequences of his actions.

After the testimony of this witness, during a conference, the court informed the defendant that an instruction patterned on MAI–CR 2d 3.74, Mental Responsibility: Diminished Mental Capacity, would be given at the defendant's request, whether or not the defendant withdrew his plea of not guilty by reason of mental disease or defect. Defense counsel stated the purpose of the latter plea had been to inject into the case sufficient evidence for an instruction

on diminished mental capacity. The admissibility of evidence of diminished capacity in the absence of such a plea is discussed in *State v. Alexander*, 693 S.W.2d 216 (Mo. App.1985). After making that statement, the defendant withdrew his plea of not guilty by reason of mental disease or defect.

The defendant then called John C. McWay, Jr., Ph.D., a clinical psychologist. Dr. McWay had examined and evaluated the defendant under the provisions of § 552.030.4, RSMo 1978.

Upon direct examination, Dr. McWay testified that the defendant had a borderline personality defect. He added that the defendant would have difficulty in controlling his impulses.

The defendant's first point arises from the cross-examination of Dr. McWay. That first point is that the trial court erred during such cross-examination in admitting Dr. McWay's testimony that defendant was capable of forming the intent to kill the victim,

> because this was not a proper subject for expert witness testimony and covered an ultimate issue for the jury to decide in that Dr. McWay had no special scientific or other knowledge which would assist the jury in understanding the evidence in that intent is a (fundamental) [sic] question which only the jury may determine based on non-conclusory evidence properly placed in evidence before it.

Even after resorting to the defendant's argument, his basis for that point is not clear. The defendant had established the extensive qualifications of Dr. McWay. The state developed the fact that he was licensed by the state to evaluate persons under § 552.030. See Annot., Qualification of Non-medical Psychologist to Testify as to Mental Condition or Competency, 78 A.L.R.2d 919 (1961).

■ The state did not ask Dr. McWay to speculate concerning the defendant's actual intent or what the defendant actually realized. The propriety of such testimony is not before the court. The defendant had introduced evidence that he suffered a mental disease or defect. The state then elicited the opinion of Dr. McWay that the defendant had no mental disease or defect and was capable of forming an intent to kill. The mental status of the defendant was a proper subject for expert testimony. Annot., Criminal Law—Mental Condition, 22 A.L.R.3d 1228 (1968). The subject of his expert opinion was not common knowledge and it was not barred because it invaded the province of the jury. *State v. Taylor*, 663 S.W.2d 235 (Mo. banc 1984); *Housman v. Fiddyment*, 421 S.W.2d 284 (Mo. banc 1967).

Whether or not an expert opinion that a defendant had a mental disease or defect which prevented him from forming a specific intent is admissible, in the absence of statute, is not before the court. See *State v. Edwards*, 486 S.W.2d 224 (Mo.1972); *State v. Thompson*, 695 S.W.2d 154 (Mo. App.1985); Annot., Expert Testimony—Criminal Intent, 16 A.L.R.4th 666 (1982). At the time of the offense and at the time of trial, it was provided in § 552.030.3, RSMo 1978, as follows: "Evidence that the defendant did or did not suffer from a mental disease or defect shall be admissible (1) To prove that the defendant did or did not have a state of mind which is an element of the offense; ...." Under that sub-section, the opinion of Dr. McWay that the defendant was capable of forming the intent to kill was admissible. Cf. *State v. Anderson*, 515 S.W.2d 534 (Mo. banc 1974). Also see *State v. Cason*, 596 S.W.2d 436 (Mo.1980), cert. denied, 449 U.S. 982, 101 S.Ct. 397, 66 L.Ed.2d 243 (1980).

Consideration of the defendant's second point requires a preliminary statement of the evidence bearing upon that point. It is obvious from the record the defendant sought to convince the jury that Angela lived a nefarious life, while he was, in terms used by the trial court, "lily white." The apparent purpose was to aid in establishing that he acted in anger or agitation, provoked by the unexpected taunting by Angela. This effort is demonstrated by

the defendant's explanation for Angela's dying prayer.

He continued this effort by presenting as a witness Lisa Doolittle. Upon direct examination, Doolittle testified, among other things, that Angela went out with other men and teased the defendant about other men. She added that Angela went out with other men while the defendant was in Italy. On cross-examination, the prosecuting attorney asked Doolittle if it wasn't true the defendant had venereal disease when he returned from Italy. The witness answered that she didn't know, she heard others talking about it, so she could not say. After the answer was given, the defendant moved for a mistrial.

The defendant's second point is that the trial court erred in denying his request for a mistrial because the question was not asked in good faith and called for irrelevant and prejudicial evidence. The first facet of this point is readily dispelled by the record. It shows the prosecuting attorney did have a basis in fact for asking the question in good faith.

■ The defendant's trial strategy causes the second facet of that point to have no merit. By that strategy, the defendant had made relevant the information sought to be elicited by that question. "Such questioning was within the scope and cumulative of matters brought into the case by defendant upon his examination in chief." *State v. Murphy*, 592 S.W.2d 727, 731 (Mo. banc 1979). Also see *State v. Brown*, 607 S.W.2d 881 (Mo.App.1980).

■ Moreover, the defendant did not object to the content of the answer or request any relief other than a mistrial. Giving the defendant the benefit of any doubt, the trial court noted the answer was vague. Sua sponte it instructed the jury to disregard the question and the answer. Even upon a valid objection, the declaration of a mistrial is a drastic remedy and should be exercised only when the prejudicial effect of an error can be removed in no other way. *State v. Davis*, 653 S.W.2d 167 (Mo. banc 1983). A defendant may not restrict

the action of the trial court by limiting the relief he seeks to a mistrial. *State v. Hill*, 614 S.W.2d 744 (Mo.App.1981). Whether or not the relief of a mistrial is required is within the discretion of the trial court. *State v. Carter*, 641 S.W.2d 54 (Mo. banc 1982), cert. denied, 461 U.S. 932, 103 S.Ct. 2096, 77 L.Ed.2d 305 (1983). The defendant has not established the trial court abused its discretion. His second point is denied.

The verdict directing instruction submitting murder in the second degree was patterned upon MAI–CR 2d 15.14. By his third point, the defendant contends that instruction was prejudicially erroneous because it included "the alternative choice of the jury being able to find the appellant had either 'taken the life of' or 'caused serious bodily harm to' the victim...." The verdict directing instruction complained of did not contain the language set forth in the defendant's third point. Paragraph Second of that instruction did require a finding that "the defendant intended to take the life of or cause serious bodily harm to Angela Michelle Cole." To establish that the instruction was erroneous, the defendant quotes and relies upon the following:

> Parentheses enclose matters which may or should be either omitted or included depending upon the facts of the particular case submitted. In some cases it is easily apparent whether the matter in parentheses should be omitted or included. In other cases directions or suggestions in that respect are included in the Notes on Use. Where two or more words, phrases or matters are set out in successive and adjoining sets of parentheses, that word, phrase or matter applicable to the case at hand will be used to the exclusion of any other alternative offered.

MAI–CR 2d "How to Use this Book", p. XVI, February, 1983. This quotation does not, as the defendant contends, establish the instruction was erroneous within the meaning of Rule 28.02(e). The defendant fails to quote the following: "In rare cases more than one alternative may be employed

linked with an 'and' or an 'or,' but whether conjunctively or disjunctively joined both alternatives must be supported by evidence." *Id.* The question is whether or not the disjunctive submission of intent was proper in this case.

■ The disjunctive submission of an element of an offense in a single instruction can present an issue of unanimity. *State v. Oswald,* 306 S.W.2d 559 (Mo.1957). See generally *United States v. Gipson,* 553 F.2d 453 (5th Cir.1977); *State v. James,* 698 P.2d 1161 (Alaska 1985). The disjunctive submission of two distinct acts by which an offense could have been committed has been held to be erroneous. *State v. Oswald,* supra. On the other hand, it has been declared that the disjunctive submission of alternative means by which a single crime is committed is proper. *State v. James,* supra. Cf. *State v. Esker,* 658 S.W.2d 49 (Mo.App.1983); *State v. Danforth,* 654 S.W.2d 912 (Mo.App.1983). Such alternative submissions are generally approved where each of the means of committing the offense is supported by the evidence and they are in the same "conceptual grouping." *United States v. Freeman,* 619 F.2d 1112 (5th Cir.1980), cert. denied, 450 U.S. 910, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981). Further discussion of these divergent viewpoints is not required. No case has been cited or found which condemns the disjunctive submission of alternative intents, each of which is supported by the evidence and each of which is sufficient to establish the defendant's guilt. Such submission is generally approved by the cases which are cataloged in *State v. James,* supra. This court holds that the alternative submission of the mental element in paragraph Second was not error.

■ Further, the disjunctive submission in question has been approved under another principle. The mental state of an intent to cause serious bodily harm was sufficient to sustain the defendant's conviction of murder in the second degree. *State v. Mannon,* 637 S.W.2d 674 (Mo. banc 1982). "Accordingly, the submission of an intent to kill or intent to do serious bodily harm is

not error where there is evidence of an intent to kill. If the state wants to take on this additional burden, there can be no error to the defendant." *State v. Winters,* 579 S.W.2d 715, 717 (Mo.App.1979). Also see *State v. Hawkins,* 418 S.W.2d 921 (Mo. banc 1967); *State v. Reed,* 642 S.W.2d 639 (Mo.1982). The circumstances of this case provide evidence of defendant's intent to kill. See *State v. Hills,* 645 S.W.2d 57 (Mo.App.1982). The defendant's third point has no merit.

The defendant's next point is that the trial court erred in rejecting a converse instruction offered by the defendant. The tendered instruction reads as follows:

### INSTRUCTION NO. C

If you find and believe from the evidence:

That the defendant did not intend to take the life of Angela Cole, or

That the defendant did so in anger suddenly provoked by the unexpected acts of Angela Cole,

Then you must find the defendant not guilty of murder in the second degree.

■ The tendered instruction is apparently drawn from MAI–CR 2d 3.04. The first clause of the tendered converse instruction does not properly converse the state's verdict directing instruction. It was not error for the trial court to reject the improper tendered converse instruction. *State v. Healey,* 562 S.W.2d 118 (Mo.App. 1978).

The defendant's fifth point is that the trial court erred in overruling an objection to a portion of the concluding argument by the prosecuting attorney. The argument complained of was as follows: "Guilty of manslaughter. Without question, he's guilty, there's no question about that. But if you return a manslaughter verdict in this case, it's just like you've pinned a note on him, put him back on the bus to his sister's in Omaha, a nice little note that says, 'Please don't let me do this again.'" The defendant contends the action of the trial court constitutes reversible error because

that argument was an impermissible assertion the defendant would commit a crime in the future. He cites *State v. Raspberry,* 452 S.W.2d 169 (Mo.1970). That case is not controlling. In *Raspberry* there was a clear and direct plea to the jury to keep the defendant from doing it again.

The thrust of the quoted portion of the argument in this case must be determined from the context in which it was made. *State v. Newlon,* 627 S.W.2d 606 (Mo. banc 1982). The state may argue for a severe punishment as a deterrent to others. *State v. Hubbard,* 659 S.W.2d 551 (Mo.App.1983). In his closing argument the defendant had vigorously emphasized the defendant's borderline personality defect, his lack of intent and impulsive behavior. He pleaded for a verdict of manslaughter.

■ Immediately before making the statement complained of, the prosecuting attorney told the jury: "You're the only people, the only people that can tell this defendant and others like him who do similar things that if you're going to commit this type of act, there's a price to pay, and be prepared to pay it." The statement complained of, considered in the context of this preceding remark and the balance of the concluding argument, was a plea for a verdict of murder in the second degree as a deterrent to others. See *State v. Wilkerson,* 616 S.W.2d 829 (Mo. banc 1981); *State v. Hubbard,* supra; *State v. Henderson,* 510 S.W.2d 813 (Mo.App.1974). The defendant's fifth point is denied.

For his last point the defendant contends the trial court erred in overruling his motion for acquittal made at the close of the state's case. The defendant contends this was error because in the opening statement the state failed to outline "how it would establish the element of intent to commit the crime and in the absence of anger."

■ The purpose of the opening statement is to advise the jury of the nature of the case, the facts the state intends to prove and to inform the defendant of the contemplated course of prosecution to enable him to fairly meet the charge. *State*

*v. Browner,* 587 S.W.2d 948 (Mo.App.1979), 16 A.L.R.4th 795 (1982).

> The court has the power to direct a verdict of acquittal without hearing any evidence should the prosecutor fail in his opening to state facts which, if proved, would be sufficient to convict the defendant.... In determining the sufficiency of the opening statement, the facts stated and the reasonable inferences favorable to the state to be drawn therefrom are to be accepted by the trial court as true.

Missouri Criminal Practice, Second Edition, Vol. II, The Missouri Bar, § 23.3 (1984) (citations omitted).

[10] It is not necessary to consider that the timing of the defendant's motion deprived the state of an opportunity to embellish its statement. See *State v. Gray,* 423 S.W.2d 776 (Mo.1968); *State v. Seddens,* 680 S.W.2d 364 (Mo.App.1984). The required intent to kill or cause serious bodily harm may be inferred from the circumstances of the crime, including the use of a deadly weapon upon a vital part of the body. *State v. Tate,* 637 S.W.2d 67 (Mo.App.1982). Among other things, the prosecuting attorney told the jury the evidence would show the following: The defendant inflicted ten stab wounds upon his ex-wife, from which she died; that his ex-wife had suffered additional defensive wounds on her hands and arms; that her body was rolled in a comforter; and after his arrest, the defendant said he deserved to die. The circumstances so stated were sufficient to establish the required intent. *State v. Davis,* supra. The defendant's final point is denied. The judgment is affirmed.

PREWITT, C.J., HOGAN, P.J., and CROW, J., concur.